UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

                                               Case No. 809-75956-reg

VICTOR SCOTTO,

                                               Chapter 7

                          Debtor.
----------------------------------------------------------------x

## <u>MEMORANDUM DECISION</u>

There are three motions before the Court.  In the order in which they were filed, first, there is the Chapter 7 Trustee's motion ("Trustee's Contempt Motion"), dated November 3, 2009, seeking to hold the Debtor in contempt of Court for his failure to comply with an Order of the Court, dated September 24, 2009, directing the Debtor to, among other things, appear at the Section 341 meeting of creditors and file complete schedules and a statement of financial affairs prior to the meeting.  Second, is the Debtor's motion, dated December 28, 2009, to dismiss this bankruptcy case *nunc pro tunc* to the August 19, 2009 petition date ("Motion to Dismiss").  The Debtor claims that this petition was filed fraudulently and therefore it should be declared a "legal nullity" and the Court's record of this case should be expunged in its entirety.  Finally, by Motion, dated March 2, 2010 (the "Stay Motion"), the Debtor has asked this Court to stay its Order, dated December 21, 2009, which directed the Debtor and any other persons in possession of the Debtor's residence to vacate the property by January 15, 2010.

The first two of these motions were reported settled among the Debtor, the Chapter 7 Trustee and the Office of the United States Trustee on January 14, 2010.  The proposed settlement included an agreement to dismiss the case and "expunge" the record in its entirety.  At that time, the Court declined to approve the settlement prior to a full hearing on the matters due to allegations of fraud and potential criminal activity, and concerns about significant abuses of

the bankruptcy process. (January 14, 2010 Transcript ("Tr.") at 10-13). On January 14, 2010 and January 25, 2010, the Court heard testimony by the Debtor, his son Robert Scotto, James R. Luca, Joseph J. Giordano, Esq. and Kenneth Pelsinger, Esq. At the conclusion of testimony, it appeared that an acceptable settlement among the parties had been reached.[1] On January 27, 2010, the Court adjourned the matters at the request of the parties to allow them time to finalize a stipulation of settlement. One month later, on February 24, 2010, the parties were still working out the details of the settlement and a further agreement was reportedly reached concerning the payment of administrative costs incurred during the pendency of the case.

On February 25, 2010, the parties reported to the Court that the settlement had fallen apart. Shortly thereafter, the Debtor filed the Stay Motion seeking to enjoin the Trustee from evicting him and his family from his residence pending resolution of the Motion to Dismiss. A hearing on the Stay Motion was held on March 3, 2010.

On March 10, 2010, all matters were marked fully submitted and the record was closed.

### *Jurisdiction*

This Court has jurisdiction over this core proceeding pursuant to 11 U.S.C. §§ 1334(b) and 157(b)(2) and the Eastern District of New York standing order of reference dated August 28, 1986. This opinion constitutes the Court's findings of fact and conclusions of law to the extent required by Fed. R. Bankr. P. 7052.

---

[1] At that time, the Office of the United States Trustee was not a party to the settlement and expressed concerns about expungement of the record.

### The Bankruptcy Court Record

On August 10, 2009, a  Chapter 7 petition was filed with this Court on behalf of Victor Scotto ("Debtor").  The petition bore the Debtor's name, social security number, address, the signature of Joseph Giordano, Esq. ("Giordano"), as his counsel, and what appeared to be the signature of the Debtor.  The petition was accompanied by a Certificate of Credit Counseling issued by Black Hills Children's Ranch, Inc., on August 10, 2009 stating that the Debtor received credit counseling by internet and telephone pursuant to 11 U.S.C. §§109(h) and 111.  Neither schedules nor a statement of financial affairs were filed with the petition.

On August 13, 2009, a notice of deficient filing was mailed to the Debtor and Giordano along with a notice of the bankruptcy filing and the date and time of the Section 341 meeting.

On August 18, 2009, Giordano docketed a one page "motion to dismiss" stating: "Whereas this case has been converted into a chapter 7 case.  The undersigned hereby request (sic) an order dismissing this case."  The motion was accompanied by a notice which requested that it be considered submitted and decided on the papers.  The motion was not scheduled for a hearing, nor was it served on any party.  The Trustee filed opposition to the motion on both procedural and substantive grounds.  First, the Trustee correctly noted that a motion to dismiss a Chapter 7 case must be done on notice to all creditors. *See* 11 U.S.C. §707; Fed. R. Bankr. P. 1017(a).  Second, the Trustee informed the Court that he was in the process of obtaining significant funds from one of the Debtor's bank accounts that could potentially be used to pay creditors of the estate.  However, without complete and accurate schedules, the Trustee could not determine whether dismissal was in the best interests of creditors.  The Trustee's opposition was served on the Debtor and Giordano on August 21, 2009.

On August 25, 2009, Giordano filed a second motion to dismiss and requested an expedited hearing date.  Giordano argued that the Debtor was being prejudiced by the pending Chapter 7 case because his bank accounts were frozen ("even though neither [bank] was listed as a creditor") and he was unable to access funds necessary to pay his bills.  On August 31, 2009, Giordano filed an affirmation in support of the second motion to dismiss along with a notice of motion scheduling a hearing on September 14, 2009.  Giordano's affirmation stated that the Debtor was a defendant in two pending civil actions based upon personal guarantees which were in default and "dangerously close" to judgment.  According to Giordano's affirmation, Giordano's "sole motive was to protect [his] new client the best way [he] could and to act as his advocate, with both of those goals seemingly accomplished by seeking bankruptcy protection." (Giordano Aff. ¶5).  Giordano filed affidavits of service showing that the second motion to dismiss was served only upon Bethpage FCU (on August 30, 2009), VW Credit (on August 30, 2009) and HSBC Card Services (on September 9, 2009).

On August 31, 2009, the Trustee filed a Notice of Discovery of Assets which was then mailed to the Debtor and Giordano, among others, on September 3, 2009.

A hearing was held on September 14, 2009 on the Debtor's second motion to dismiss. Kenneth Pelsinger, Esq. appeared at the hearing on the Debtor's behalf and argued that the case should be dismissed because Giordano did not have any experience in bankruptcy matters and if he did he never would have advised Mr. Scotto, whose assets exceed $10 million and are sufficient to pay all creditors in full, to file bankruptcy.  Pelsinger interestingly also asked the Court to impose sanctions on Giordano including requiring him to attend continuing legal education courses.  At the conclusion of the hearing, the Court directed that the Debtor file

complete schedules and statements, provide the Trustee with a copy of his most recently filed tax returns, and appear at an adjourned Section 341 meeting. The Court also directed the Debtor to re-serve the motion to dismiss on 20-days' notice to all creditors and adjourned the Debtor's motion to October 19, 2009. This ruling was memorialized in an Order, dated September 24, 2009. Giordano received electronic notice of that Order immediately upon its entry.

On September 26, 2009, the Court's noticing center mailed to the Debtor and Giordano, among others, a final notice of deficient filing.

The October 19, 2009 hearing was adjourned to November 16, 2009 at which time the Trustee appeared and advised the Court that the Debtor had failed to comply with the September 24th Order. The Trustee further advised that from his own investigation it appeared that the Debtor owned real property worth between $8 - $10 million with approximately $4 - $5 million of equity. The Trustee also informed the Court that New York State Department of Tax and Finance filed a proof of claim in the amount of $328,000. Neither the Debtor nor his counsel appeared at the November 16th hearing. At that time, the Court denied the Debtor's motion to dismiss and gave the Trustee a return date for a hearing on a motion to evict the Debtor from the real property. The Court directed the Trustee to inform Giordano that if the Debtor did not show up for the adjourned Section 341 meeting, the Court would entertain a motion to hold him in contempt and direct the U.S. Marshal to compel his appearance. On November 25, 2009, the Court entered an order denying the Debtor's motion and directing the Debtor to appear at the next hearing in the case. Giordano received electronic notice of the entry of that Order on the Debtor's behalf.

On November 5, 2009, the Trustee filed a motion to hold the Debtor in contempt and

impose monetary sanctions against him for his failure to comply with the September 24th Order. The motion was served on the Debtor and Giordano on November 5, 2009.  Giordano filed an affirmation in opposition to the Trustee's motion which started with a disclaimer that Giordano is not an experienced bankruptcy lawyer and goes on to admit that it was on Giordano's advice that the Debtor had "little participation, if any, in this case."  (¶¶ 6, 7).  In sum, Giordano argued that the Debtor should not be held in contempt because he, in fact, filed the required schedules on December 7, 2009[2] (the same date the opposition was filed).

On November 18, 2009, the Trustee filed a motion to compel the Debtor and all of the occupants of the Debtor's real property to vacate the real property and surrender possession to the Trustee in furtherance of the Trustee's efforts to sell the property for the benefit of creditors. The motion was served on the Debtor and Giordano on November 18, 2009.  Giordano filed an affirmation in opposition to the Trustee's motion to compel arguing that the Trustee's efforts to sell the property were not in the best interest of the estate.  Giordano reasserted his argument that a petition should never have been filed in this case because Mr. Scotto is not a "true candidate" for bankruptcy.

The Trustee's November 5th motion for contempt and his November 18th motion to compel both were scheduled for hearing on December 14, 2009.  Neither the Debtor nor

---

[2]

On December 7, 2009, incomplete schedules were filed on the Debtor's behalf by Giordano's law office, bearing what purports to be the Debtor's signature.  Schedules A and D list the Debtor's real property with a value of $14.9 million encumbered by $4.7 million in secured liens. Schedule E lists $74,262 in priority tax debt, and Schedule F shows $297,013 in general unsecured debt.  The filed documents (a combination of Schedule I and the last page of the Chapter 7 means test) show that the Debtor is self-employed and has a $3,397 shortfall in monthly net income.

Giordano appeared on that date.  At the hearing, the Court granted the Trustee's motion to compel the Debtor to vacate his residence, and adjourned the Trustee's motion for contempt so that the scope of the Debtor's contempt might be decided on a more complete record.  An Order was entered on December 21, 2009, directing the Debtor to surrender possession of his residence to the Trustee no later than January 15, 2010, failing which the Trustee could obtain the assistance of the United States Marshals to evict the Debtor, and any other occupants, from the premises.  This Order is final and non-appealable.[3]

On December 28, 2009, the Debtor, represented by the law firm of Certilman Balin Adler & Hyman, LLP ("Certilman Balin")[4], filed the instant motion to dismiss this Chapter 7 filing *nunc pro tunc* to the August 10, 2009 filing date and determine that the case is a legal nullity and void *ab initio* and therefore should be expunged from the Court's filing system.  According to the motion and the supporting affidavits: (i) the signature on the Debtor's bankruptcy petition was forged by James R. Luca, an office employee of the Debtor's purported bankruptcy counsel, Giordano, (ii) the Debtor never received credit counseling from Black Hills Children's Ranch on August 10, 2009, (iii) the Debtor first learned of the bankruptcy filing on August 12, 2009 when he attempted to pay his hotel bill while on vacation in Italy and the credit card was not accepted. The papers posit that the Debtor's son, Robert Scotto consulted Giordano and Luca in connection with a legal matter that Robert was handling on behalf of Alexis Limousine ("Alexis"), a company owned by the Debtor and managed by Robert.  Apparently, Alexis was

---

[3]

 An appeal was filed by Giordano on the Debtor's behalf on December 28, 2009.  That appeal was withdrawn on February 25, 2010.

[4]

Certilman Balin's representation of the Debtor in this case is limited to the motion to dismiss, and subsequently, to the Stay Motion.

facing potential judgments in two civil actions which would have resulted in personal liability for the Debtor as a result of his individual guarantees. The Debtor's motion acknowledges that Giordano filed the bankruptcy petition as a "negotiating strategy to gain leverage in dealing with the plaintiffs in the State Court Actions." (Motion to Dismiss ¶ 5).

Luca filed an affidavit in support of the motion to dismiss stating that he signed the Debtor's name on the bankruptcy petition believing he had the authority to do so. According to Luca he is a friend of Robert's and was giving advice to him in connection with the Alexis litigation. In his affidavit Luca, who is not a lawyer, states:

> "Upon hearing the facts and circumstances surrounding the State Court Actions, in an effort to protect Victor Scotto's interests, ... I recommended to Robert Scotto that Victor file a Chapter 7 petition as a negotiating strategy to gain leverage in dealing with the plaintiffs in the State Court Actions.
>
> Victor Scotto did not supply the Giordano Law Firm with any financial information regarding his assets and liabilities.
>
> A skeletal petition was prepared for the signature of Victor Scotto. I signed the petition for Victor Scotto in an effort to assist Robert Scotto to forestall judgments being entered against his father in the State Court Actions.
>
> Joseph J. Giordano, Esq. was unaware of the fact that I signed Victor Scotto's name on the Chapter 7 petition.
>
> At the time I signed the petition, I was under the misimpression that Victor Scotto's petition would be dismissed for failure to file all required statements and schedules.
>
> When Victor Scotto found out about the bankruptcy filing on or about August 12, 2009, the Giordano Law Firm commenced a proceeding to withdraw the petition. However, the Trustee opposed the motion and the Court directed that the Debtor file all required Statements and Schedules and that the Trustee be permitted to examine the Debtor pursuant to Section 341(a) of the Bankruptcy Code.
>
> On behalf of the Giordano Law Firm, I failed to keep Victor Scotto apprised of the necessity for his appearance at a Section 341 meeting of creditors,

assuring him that the case would be dismissed on procedural grounds.

I was under the impression we had the authority to sign for Victor Scotto.

The results of my actions resulted in unexpected consequences to Victor Scotto, including the impending eviction of him and his family from the family residence in Sands point, New York, for which I am profoundly sorry.  I am also sorry to have placed the Giordano Law Firm in this position.

(Luca Aff. ¶¶ 4 - 12).

The Debtor's affidavit in support of the motion states that he was never consulted about this litigation strategy and never supplied the Giordano law firm with any financial information regarding his assets.  (Debtor's Aff., dated December 28, 2009 ("Debtor's Aff."), ¶ 5).  The Debtor argues that he never would have consented to a bankruptcy filing if he had been consulted because of the negative effect such a filing would have had on his significant business enterprises which include restaurants in both New York and Nevada, the related liquor licenses, and his future intention of applying for gaming licenses in the State of Nevada.  The Debtor says he did not appear at the Section 341(a) meetings because "Giordano had informed [him] that the case would be dismissed on procedural grounds based on numerous deficiencies described in notices from the Court.  Thus, I relied on the representations of the Giordano Law Firm and my son Robert that everything was under control and that I should not be concerned with the notices received from the Court and/or the Trustee."  (Debtor's Aff. ¶ 15).

According to the Debtor he returned to New York from Las Vegas on December 13, 2009 so that he would be able to attend a hearing before this Court on December 15, 2009 and finally clear up these matters.  The referenced hearing was actually scheduled for December 14, 2009 but was miscalendared by Giordano's office, which is why, according to the Debtor, he did not

appear at the December 14th hearing. According to the Debtor, on December 15th he met Pelsinger in the Courthouse cafeteria and learned that the hearing had already occurred on December 14th. He was informed that the Court ruled that he must vacate his residence by January 15, 2010. The Debtor then called a meeting among himself, Robert, Giordano, Luca and Pelsinger for December 21, 2009. Following this meeting, on December 23, 2009, the Debtor retained what he describes as experienced bankruptcy counsel.

The Trustee opposes the Debtor's motion to dismiss and argues that the Debtor did in fact authorize the bankruptcy filing and, even if he did not, he ratified the filing by failing to take timely steps to repudiate it. Further, the Trustee argues that the Debtor should be estopped from seeking to dismiss this case because he may have used it to his advantage against his creditors during the pendency of the case. The Trustee correctly points out that it took the Debtor nearly four months to inform this Court that he had never consented to the filing of this case. In fact, the Debtor did seek to have the case dismissed, however in none of those pleadings is there even a suggestion that the case was filed without his consent. The Trustee indicates that he might not have opposed dismissal if full and complete schedules were filed by the Debtor disclosing the full extent of his assets and liabilities with the assurance that creditors would be paid in full.

### The Testimony

The testimony received in this case does not significantly differ from the "story" told in the papers. The Debtor is a prominent businessman who, together with his family, owns an assortment of restaurants, catering halls, hotels and real property in the New York metropolitan area and in Las Vegas, Nevada. (Tr. at 26-32). The Debtor estimates that his total income from

all sources is approximately $1 million per year.  (Tr. at 99).  Included among his business

interests is a limousine company called Alexis Limousines which used a fleet of about a dozen

leased limousines to provide transportation services to clients of certain of the Debtor's catering

halls. (Tr. at 79).  At some point in or around 2009, one or more of the limousine lessors sued

Alexis for defaults under the lease or leases.  The Debtor testified that he did not get personally

involved in the Alexis litigation but that he delegated to his son, Robert, the authority to handle it

on his behalf.  (Tr. at 82, 90, 94).  Robert sought the assistance of the law firm, Cullen and

Dykman, to represent Alexis in this matter.  (Tr. at 253).  However, Alexis did not have the

ability to pay the arrears to settle the matters.  The plaintiffs would not work with Alexis to

lower the amount of the arrears and the negotiations by Cullen and Dykman did not result in a

resolution of the matters.  (Tr. at 253-54).

Robert testified that he first met Luca in July 2009 when he and his brother, Victor

Scotto, Jr., began leasing office space in a building owned by Luca's wife.  (Robert's Testimony

at 257).  Luca first met the Debtor when he showed the office space and negotiated the lease.

After that Luca saw the Debtor only in passing on occasions when the Debtor was visiting his

sons at the office. (Tr. at 117- 119).

Giordano is an attorney who also leases office space in Luca's wife's building.  He is a

solo practitioner admitted to practice law in July 2006.  (Tr. at 143).  His practice is focused

mainly on state court foreclosures although he admits to having filed four Chapter 7 cases during

his career.  He testified he did not charge his clients for any of the bankruptcy filings because

they were either filed for relatives or as favors.  (Tr. at 144).  In November 2008, Giordano hired

Luca to act as an "office manager" to handle calendaring matters and answer phones. (Tr. at 115,

117).  Giordano pays Luca $50,000 per year plus health benefits.  (Tr. at 191).

Robert and Luca developed a friendship which included discussing Alexis's financial problems.  (Tr. at 257).  At that time, Robert testified that he did not know that Luca was working for Giordano and he did not know whether Luca was an attorney. (Tr. at 258). Sometime in early August 2009 (one month after they first met) Luca indicated to Robert that he could help negotiate a resolution of the Alexis litigation or help to "buy a little time."  (Tr. at 259).  Robert requested the file back from Cullen and Dykman and turned it directly over to Luca.  (Tr. at 260-61, 304).  According to Robert, Luca told him that he would file a "skeleton petition" "just listing these two creditors, in that essentially a skeleton petition was something that would allow me to buy a little bit of time and possibly negotiate with the creditors, which I said is it legal, is it something that's okay, which Luca ultimately said to me it's not a big deal, it's something that'll go through, it'll be presented to the creditors, and essentially, you know, it'll be a negotiating tool. ... basically warning your creditors that you may go into bankruptcy if you cannot satisfy the debt or clear it up with the creditors. ... "  (Tr. at 261-62, 316).  At that time, Robert testified that he did not know that a "skeleton petition" was a bankruptcy petition, and it was not clear to him whether the filing would be in Victor's name or Alexis's name.  (Tr. at 261-62).  Robert also testified that he never authorized Luca to file a bankruptcy petition in his father's name and would never do so because of his father's extensive business interests.  (Tr. at 263, 306).

As part of his strategy to help Robert resolve the Alexis litigation, Luca told Giordano that the Debtor wanted to file bankruptcy (Tr. at 122).  Luca testified that he did not discuss the bankruptcy filing with the Debtor at the time it was prepared and filed.  (Tr. at 122-23).  Luca

also testified that he signed the Debtor's name on the bankruptcy petition.[5] He "assumed" he had Robert's permission to do so because of the "demeanor and the direction" of the conversation he was having with Robert about how to handle the Alexis litigation. (Tr. at 125-126).

Giordano testified that he never spoke to the Debtor directly about this bankruptcy filing, and he was never retained by the Debtor nor was he retained by the Alexis. (Tr. at 146, 207). Despite the fact that he had no attorney client relationship with the Debtor or Alexis, Giordano called the plaintiffs in the Alexis lawsuits, Volkswagen Credit and Bethpage Credit Union, and told them that he was representing the Debtor in efforts to obtain a settlement. (Tr. at 220-221). Luca later told Giordano that the Debtor wanted to file bankruptcy. Giordano gave Luca the bankruptcy forms and a list of information that he needed from the Debtor in order to file a bankruptcy petition. Luca in turn got that information from Robert and returned a signed and completed petition to Giordano. (Tr. at 146, 151, 122). Giordano assumed that the information on the petition was obtained from the Debtor and that the signature on the petition was the Debtor's. (Tr. at 147). Luca did not tell Giordano that he had signed the Debtor's name on the petition. (Tr. at 147).

Giordano then signed the petition as the Debtor's counsel (Tr. at 148). According to

---

[5]

During Luca's testimony, the Court advised him that there might be serious implications to the testimony he had given, at which point, Luca, who was not represented by counsel at the hearing, chose not to answer certain questions on direct examination, but rather invoked his rights under the Fifth Amendment to the United States Constitution (Tr. at 129-133). Luca's examination continued briefly after he first invoked his Fifth Amendment rights. He chose to answer some questions and not others. The Court ultimately decided to terminate his testimony. (Tr. at 140). The parties have stipulated that both Luca's partial testimony and his affidavit may be considered by the Court in rendering this Decision.

Giordano he waived his fees and paid the filing fee for the Debtor in this case because "Mr. Luca told me a friend of his wanted to do a Chapter 7, and I paid for it. ... [I]t was a favor to do the Chapter 7. I wasn't going to charge any money. And I know what you're saying; you understand I don't charge, but why lay out the cost. But that was how I wanted to do it. I didn't want to charge any money."[6] (Tr. at 193).

Despite having provided critical information to Luca, Robert testified that he first learned of the bankruptcy filing when his father called him from Italy and told him about it. (Tr. at 264). Robert then called Luca who promised that he would take care of having the bankruptcy dismissed. (Tr. at 266). It was at this point that Robert realized that Luca was not an attorney but rather was Giordano's paralegal.[7] Based upon Luca's reassurances, Robert told his father that he did not have to worry about the bankruptcy and that it would be "kicked out." (Tr. at 266, 311). Robert received periodic promises from Luca and Giordano over the next few months that the case would be dismissed. (Tr. at 267). Robert testified that his father gave him some "letters" related to the bankruptcy and Robert continued to assure him that the case would be dismissed. (Tr. at 270).

Giordano testified that he believed the Court was getting "extremely impatient" with his lack of bankruptcy experience and failure to participate in the case and he attempted to bring the

---

[6]

Giordano filed a Chapter 7 petition for the Debtor's daughter, Victoria Scotto, on August 6, 2009, just four days prior to the Debtor's bankruptcy filing. He testified that he filed Victoria's case as a favor to Luca. Giordano did not charge Victoria a fee for his services and he paid the filing fee for her. (Tr. at 195-96). Victoria's case was dismissed pursuant to 11 U.S.C. §521(i) on September 21, 2009, and was closed on September 30, 2009.

[7]

Robert testified that he first told Giordano around August 14th or 15th that the bankruptcy file was not authorized by the Debtor or himself. (Tr. at 269). Prior to that time, Robert had little or no communication with Giordano about the bankruptcy filing.

Debtor into compliance with his duties under the Bankruptcy Code (Tr. at 156).  In paragraph 7 of Giordano's affirmation in opposition to the contempt motion, Giordano stated that "[he] advised the Debtor that [he] could handle the matter with little participation from him." It appears from the testimony that Giordano never directly advised the Debtor, but rather he advised Luca to advise the Debtor.  (Tr. at 230-31).  Giordano testified that he advised Luca that the bankruptcy case would be "handled without a problem."  (Tr. at 230).  At no time prior to the end of December 2009 did the Debtor advise Giordano that he did not sign the bankruptcy petition. (Tr. at 234).  In fact the Debtor did not even call Giordano and question why he had filed a bankruptcy petition on his behalf.  (Tr. at 235).

According to Giordano, he was preparing to appear at the hearing in December on the Trustee's motion to compel the Debtor to vacate his residence but he mis-calendared the hearing for December 15th instead of December 14th.  (Tr. at 158-59).  When he realized he missed the hearing he called Pelsinger, an attorney he believed to have experience with bankruptcy matters, and asked him to take over the case for him.  (Tr. at 160).  Giordano made no attempt to contact the Debtor advising him that the Court granted the eviction motion on December 14th.  (Tr. at 225).  Instead he told Luca to advise "the Scottos" of the status of the case. (Tr. at 225).

### *Applicable statutory and case law*

The Debtor in this, his latest motion to dismiss, seeks to dismiss this chapter 7 case pursuant to 11 U.S.C. §707(a) on the theory that the petition is a legal nullity due to the forgery of his signature.  Section 707(a) provides that: "The court may dismiss a case under this chapter only after notice and a hearing and only ***for cause***, including– (1) unreasonable delay by the

debtor that is prejudicial to creditors; (2) nonpayment of any fees or charges required under

chapter 123 of title 28; and (3) failure of the debtor in a voluntary case to file, within fifteen days

or such additional time as the court may allow after the filing of the petition commencing such

case, the information required by paragraph (1) of section 521, but only on a motion by the

United States trustee."  11 U.S.C. §707(a) (emphasis added).[8]  The examples of "cause"

enumerated in the statute are illustrative and not exclusive.  *See In re Smith*, 507 F.3d 64, 72 (2d

Cir. 2007).  In deciding whether "cause" exists to dismiss a Chapter 7 case, the Court must

consider the interests of both the debtor and his creditors.  *See In re Hull*, 339 B.R. 304, 307

(Bankr. E.D.N.Y. 2006).  "'[C]reditors can be prejudiced if the motion to dismiss is brought after

the passage of a considerable amount of time and they have been forestalled from collecting the

amounts owed to them.  A prejudicial delay also creates the appearance that such an abusive

practice is implicitly condoned by the Code.  *In re Klein*, 39 B.R. 530, 533

(Bankr.E.D.N.Y.1984).' *In re Dinova*, 212 B.R. at 441 (quoting *In re Schwartz*, 58 B.R. 923, 925

(Bankr.S.D.N.Y.1986))."  *In re Hull,* 339 B.R. at 307-08.

A Chapter 7 debtor does not have an absolute right to have his case dismissed.  *See In re*

*Smith*, 507 F.3d at 72.  The burden of proof in this case is on the Debtor to show that "cause"

exists to dismiss and that creditors will not be prejudiced by the dismissal.  *In re Stephenson*, 262

---

[8]

The Debtor's motion to dismiss also cites Section 521 and the notices of deficient filing that were generated by the Court. The Debtor suggests that the case should have been dismissed on procedural grounds due to the filing deficiencies in the case.  However, Section 707(a) states specifically that a motion to dismiss for filing deficiencies under Section 521 can only be brought by motion of the United States trustee.  Moreover, this Court has the ability to override the so-called "automatic dismissal" provision in Section 521(i) if such deficiencies exist.  *See In re Acosta-Rivera*, 557 F.3d 8 (1st Cir. 2009); *In re Warren*, 568 F.3d 1113 (9th Cir. 2009). This Court's September 24th Order, in fact, directed the Debtor to comply with his duties under Section 521.

B.R. 871, 874 (Bankr. W.D. Okla. 2001). The decision to dismiss is guided by equitable considerations and is committed to the sound discretion of the bankruptcy court. *See In re Hull*, 339 B.R. at 308 (citing *In re Foster*, 316 B.R. 718, 720 (Bankr.W.D. Mo. 2004)).

As a general rule, a bankruptcy petition will be dismissed "for cause" under Section 707(a) if the debtor's signature on the petition has been forged. The theory is that a debtor's signature on a petition indicates the debtor's consent to the bankruptcy filing which consent can only be given by the debtor. *See, e.g., In re Storay*, 364 B.R. 194 (Bankr. D. S.C. 2006) (dismissing and expunging Chapter 7 case where debtors rebutted presumption that petition was signed with their authority by "credible and convincing testimony that they did not authorize" their attorney to file the petition on their behalf); *In re Washington*, 297 B.R. 662, 664 (Bankr. S.D. Fla. 2003) (finding that bankruptcy filing was a "legal nullity" where it was not signed with proper power of attorney); *In re Buppelmann*, 269 B.R. 341 (Bankr. M.D. Pa. 2001) (dismissing but declining to expunge the record of a fraudulently filed bankruptcy petition); *In re Brown*, 163 B.R. 596, 598 (Bankr. N.D. Fla. 1993) (finding petition was a legal nullity where debtor's wife forged debtor's signature on petition); *In re Harrison*, 158 B.R. 246, 248 (Bankr. M.D. Fla. 1993) (dismissing petition where creditor signed debtor's name without reference to power of attorney). *Cf. In re Phillips*, 433 F.3d 1068 (8th Cir. 2006) (upholding Rule 9011 violation and finding "attorney needs to know for certain that his client wishes to file for bankruptcy before a petition is filed"); *In re Wenk,* 296 B.R. 719, 727 (Bankr. E.D. Va. 2002) (finding "debtor's signature indicates debtor's consent to the bankruptcy filing, consent which can only be given by debtor").

However, a motion to dismiss a forged petition should not be granted as an absolute

right.  Some courts have considered the timing of a debtor's motion to dismiss in relation to the

bankruptcy filing as a factor to consider when deciding whether to grant a motion to dismiss a

forged petition.  Where a debtor remains in bankruptcy for a period of time and does not seek

dismissal of his case within a reasonable period of time it is more likely that creditors may have

relied on the bankruptcy to their detriment.  In such case, courts have been reluctant to permit a

debtor to dismiss for "cause."  *See In re Mendez*, 367 B.R. 109, 111-13 (B.A.P. 9th Cir. 2007)

(balancing debtor's and creditors' interests and denying motion to dismiss filed almost five

months after petition date); *In re Willis*, 345 B.R. 647, 652-53 (B.A.P. 8th Cir. 2006) (denying

debtor's motion to dismiss where debtor failed to mention forgery for nearly ten weeks).  *But see

In re Washington*, 297 B.R. at 663 (granting motion to dismiss forged Chapter 13 petition filed

within twenty-six days of the petition date); *In re Curtis*, 262 B.R. 619, 620-22 (Bankr. D. Vt.

2001) (dismissing petition where debtor brought a motion to dismiss in the "preliminary stage of

the case").

      In *In re Mendez*, the Bankruptcy Appellate Panel for the Ninth Circuit affirmed a

decision of the bankruptcy court which denied a debtor's motion to dismiss an allegedly forged

petition.  In that case the debtor alleged that a fellow-church member who is not an attorney,

advised her to file bankruptcy.  He prepared a bare-bones bankruptcy petition, forged her

signature, and filed it.  *Id.* at 111.  About one month later, the court issued an order to show

cause for failure to file a certificate of credit counseling.  The debtor appeared at the hearing and

filed her certificate that same day.  *Id.* at 112.  The debtor also attended three § 341 meetings in

the case.  It was not until after her third §341 meeting, where the trustee informed her that she

may not be able to keep her house, that the debtor filed a letter with the court, alleging for the

first time that her bankruptcy papers had been forged. *Id.* at 112-13. At that time the debtor requested that her case be dismissed. *Id.* at 113. After notice and a hearing, the court denied the debtor's motion to dismiss and the debtor appealed. The Ninth Circuit Bankruptcy Appellate Panel affirmed and found that despite the likely forgery of some of her signatures, the debtor knew she was in bankruptcy and only asked to leave upon the threat of her home being sold. *Id.* A balancing of the interests indicated that creditors could potentially be paid in full and the debtor could retain her full homestead exemption, thus the debtor had not met her burden to establish cause to dismiss. *Id.* at 120.

At least one court has also considered whether a debtor's post-petition conduct is such that she should be equitably estopped from seeking to dismiss, or should be deemed to have ratified, a forged or unauthorized petition. *See In re Willis*, 345 B.R. 647 (B.A.P. 8th Cir. 2006). In *In re Willis,* the Bankruptcy Appellate Panel for the Eighth Circuit affirmed the bankruptcy court's holding that the debtor should be estopped from seeking to dismiss the case because "she enjoyed the benefits, and none of the detriments (such as filing accurate schedules and cooperating with the trustee), of filing a bankruptcy petition, and because of the complete disrespect she had shown to her creditors." *Id.* at 651. In *In re Willis*, the debtor learned that her attorney had filed the bankruptcy petition without her signature very shortly after it was filed and yet she did not raise it as an issue until nearly ten weeks after the petition was filed. During those ten weeks the debtor amended her schedules five times, responded in opposition to three motions for relief from stay, and filed other pleadings in the case. *Id.* at 652. The debtor repeatedly failed to turn over documents to the trustee, failed to appear at hearings, and refused to abide by the orders of the court. Nonetheless the debtor sought the continued protection of the

automatic stay and indicated her desire to remain in bankruptcy, albeit not in Chapter 7.  The

court found that the debtor's conduct during the case should estop her from seeking to dismiss

the allegedly forged petition.  Alternatively, the court found that the debtor ratified the defective

filing by "actively participating in the bankruptcy case, albeit only in ways she deemed

beneficial to her."  *In re Willis*, 345 B.R. at 653-54.

> Under New York law, equitable estoppel,

> . . . precludes a party at law and in equity from denying or asserting the contrary
> of any material fact which he has induced another to believe and to act on in a
> particular manner. It 'rests upon the word or deed of one party upon which
> another rightfully relies and so relying changes his position to his injury.' . . .
> Parties are estopped to deny the reality of the state of things which they have
> made to appear to exist and upon which others have been made to rely. . . . New
> York's rather restrictive view of estoppel requires three elements on the part of the
> party estopped: (1) conduct which is calculated to convey the impression that the
> facts are otherwise than, and inconsistent with, those which the party
> subsequently attempts to assert; (2) intent that such conduct (representation) will
> be acted upon; and (3) knowledge, actual or constructive, of the true facts . . .
> The elements pertaining to the party asserting estoppel are (1) lack of knowledge
> of the true facts; (2) good faith reliance; and (3) a change of position . . . . These
> are commonly termed the elements of detrimental reliance.

*Holm v. C.M.P. Sheet Metal, Inc.*, 455 N.Y.S.2d 429, 433 (App. Div. 1982) (citations omitted).

> A party's silence or inaction can satisfy the "conduct" element of the test for equitable

estoppel:

> An estoppel may arise under certain circumstances from silence or inaction as
> well as from positive words or acts.  The essential elements of an estoppel so
> arising are:
> (1) a duty to speak;
> (2) a failure to speak; and
> (3) damage to another party directly due to this silence.

> For silence to work an estoppel, it must amount to bad faith and be of such nature
> as to induce another to alter his or her position so that it becomes unconscionable
> to permit the person remaining silent to enforce his or her right.  Silence operates

as an assent and creates an estoppel only when it has the effect of misleading, and where the person charged with estoppel knows or ought to know that his or her silence will be relied and acted upon and that some injury will result which his or her statement of the truth would prevent.

57 N.Y. Jur. 2d Estoppel §17 (2010).

Ratification is,

. . . the affirmance by a party of a prior act that did not bind it at the time but that was done or purportedly done on its account." . . . . Like the doctrine of apparent authority, that of ratification is "very closely associated with estoppel," though unlike estoppel, ratification does not require "a change of conduct by, or prejudice to, the innocent third party." . . . "Ratification 'must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language.' " . . . But **the required intent may be "implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence . . . .**

*In re Nigeria Charter Flights Contract Litig.*, 520 F.Supp.2d 447, 466 (E.D.N.Y.2007) (citations omitted) (emphasis added).

Ratification can be established by presenting evidence that benefits were derived through the debtor's actions or through participation in the act itself. *See In re Willis*, 345 B.R. at 653-54; *Hager v. Gibson*, 108 F.3d 35, 40 (4th Cir. 1997) (finding that conduct of persons with power to have authorized the bankruptcy filing ratified the unauthorized bankruptcy petition where debtor/corporation's fifty percent shareholder did not object to validity of the filing until more than one year after being made aware of it during which time the shareholder received the benefit of the automatic stay); *In re I.D. Craig Service Corp.*, 118 B.R. 335, 337 (Bankr. W.D. Pa. 1990) (finding board of directors waived the right to challenge unauthorized bankruptcy filing by ratification and by laches in failing to timely file a motion to dismiss) (*citing In re*

*Martin-Trigona*, 760 F.2d 1334, 1341 (2d Cir. 1985)).

> The main distinction between ratification and estoppel is that the substance of estoppel is the inducement to another to act to that person's prejudice while the substance of ratification is confirmation after the act has been performed. Accordingly, liability resulting from ratification is a liability that arises from intention, express or implied; liability resulting from estoppel, on the other hand, is liability that results despite intention because the other party will be prejudiced and defrauded by this conduct unless the law treats the principal as legally bound.

> While acts and conduct amounting to an estoppel in pais may in some instances amount to a ratification, ratification may be complete without any of the elements of an estoppel and if the act or contract in question has in fact been ratified and the ratification is sufficient, there is no need of invoking estoppel.

2A N.Y. Jur. 2d Agency §182 (2010).

### *Analysis*

The Court finds that in this case the Debtor's post-petition conduct, *i.e.*, his failure to act in a timely manner, ratified the allegedly unauthorized bankruptcy filing.  By remaining silent for four months while this case was pending and by failing to appear in Court and seek relief based upon the alleged forgery of his signature, the Debtor effectively affirmed the act which he alleges was unauthorized.  The Debtor was fully aware that his signature was affixed to a Chapter 7 bankruptcy petition.  While the Debtor remained in bankruptcy for those four months, creditors were held in abeyance and the Chapter 7 Trustee was actively engaged in the performance of his duties under Section 704 of the Bankruptcy Code to gather the Debtor's assets for the benefit of creditors and investigate his financial affairs.  During this four month period, the Debtor purposefully disregarded all directions of this Court.  His only response to repeated notices from the Court that this bankruptcy case was proceeding apace was to avoid any

responsibility by delegating the resolution of the bankruptcy case to his son.  Such a cavalier

attitude towards the orders of this Court and the bankruptcy process will not be countenanced by

this Court.  For these same reasons, alternatively, the Court finds that the Debtor should be

equitably estopped from arguing that the petition was filed without his authority.

 The Debtor's own testimony confirms that he first was made aware of the bankruptcy

filing just two days after it was filed.  He also testified that he was informed that Giordano filed

the petition on his behalf.  Nonetheless, he claims he took no steps to contact Giordano and ask

about the circumstances surrounding the filing.  He testified that he did not contact Giordano and

inform him that he did not authorize the filing.  He also testified that he took no steps to apprise

the Court of the alleged forgery.  Rather, the Debtor testified that he merely accepted the

assurances of his son, Robert, that the matter would be "cleared up."  Simply put, despite the

claim of forgery and the filing of a petition without his consent that could have grave

consequences for the Debtor, the Debtor did nothing for four months.  To this day the Debtor

remains in bankruptcy while his creditors remain bound by the automatic stay.

 It strains credulity that a sophisticated businessman with a "complicated" portfolio of real

estate holdings and "popular" restaurants and catering halls, including liquor and gaming

licenses, would rest assured on the advice of his (non-attorney) son that a fraudulently filed

bankruptcy petition, which could potentially cause immeasurable damage to his business

holdings, should be handled without the advice of experienced bankruptcy counsel.

 During the months following the bankruptcy filing, the Debtor was served with at least

six (6) notices from the Court and/or pleadings in this case, including notice of the Trustee's

motion to sanction the Debtor for failure to comply with his duties under the Bankruptcy Code.

Also included among these mailings was the Trustee's opposition to a motion to dismiss filed by Giordano on the Debtor's behalf.  This is particularly significant because it put the Debtor on notice that Giordano was continuing to take action on his behalf in the case despite the Debtor's claim that Giordano was not his attorney.  The Debtor did not deny that he received these mailings.  Rather, he testified that he turned the notices over to Robert to handle and in some cases did not even open the envelope.  It was not until the Debtor was faced with eviction from his residence that he took any affirmative action with respect to this bankruptcy case.  The Debtor's assertion that he relied on assurances that the case would be dismissed are not credible. Even if he did in truth rely upon Robert's assurance, that reliance was not reasonable.

It is significant to the Court that the Debtor gave Robert the authority to resolve the Alexis litigation on his behalf and that this petition was filed in furtherance of Robert's efforts to resolve the litigation by gaining a negotiating leverage against at least two of the Debtor's creditors.  The record still is not clear as to the status of the Alexis litigation, but it seems that the litigation has remained stayed during the pendency of this bankruptcy case and the Debtor has gained a benefit therefrom.  The Debtor testified that it was his belief that the lawsuits commenced against he and Alexis were "on hold" either because of the bankruptcy or because the Debtor had decided to discontinue negotiations while he resolved the issue of the bankruptcy filing.  (Tr. at 100).  Either way, it is clear that the Alexis litigation has been stayed by this bankruptcy filing to the prejudice of those plaintiffs.  It is less clear what prejudice has been suffered by other creditors, however the Court can only presume that those creditors who received notice of the bankruptcy filing have stayed all collection actions against the Debtor, including New York State and the Internal Revenue Service.

The Debtor's counsel's affidavit in support of the motion to dismiss contains a lengthy discussion of the harm that will befall the Debtor's vast catering and restaurant holdings if rumor spread that he had filed for bankruptcy protection.  Counsel explained the speed with which rumor of a bankruptcy filing can spread and the devastating effect it can have on advance bookings such as weddings and other special events.  This recitation was intended to show that the Debtor never would have consented to a bankruptcy case being filed on his behalf.  However, the Debtor's conduct in this case belies the veracity of this conclusion.  If the Debtor's depiction of the effects of publicity of this bankruptcy case were accurate, why would he choose to delegate such a serious matter to his son?  And why, when the case was not immediately dismissed, would the Debtor not take matters into his own hands and hire experienced bankruptcy counsel?  Why did it take over four months for this Debtor to take an interest in this case?  These questions remain unanswered.

There are still other questions that remain unanswered in this case due to the Debtor's continued failure to comply with this Court's Order, dated September 24, 2009.  For example, although schedules were filed by Giordano on the Debtor's behalf on December 7, 2009, the Debtor still has not filed a statement of financial affairs.  The Court questions the accuracy of the information contained in the schedules that were filed, for one reason, because it is the Debtor's position that Giordano never represented him.  How, then, could Giordano file schedules on his behalf?  Where did Giordano get the information to file these schedules?  The Court also questions the accuracy of the schedules because they are internally inconsistent and appear to be completely fabricated.  Schedule I shows gross monthly income of $9,000, yet the Debtor testified that his total monthly salary is approximately $30,000.  (Tr. at 99).  He further testified

that his total annual income from all sources is probably closer to $1 million.  (Tr. at 99).  The

Debtor did not file Schedule J, but rather filed pages 6, 7 and 8 of the Chapter 7 means test

which cryptically describe over $12,000 in monthly deductions from income and expenses,

including a $2,379 deduction for repayment of a mortgage to HSBC.  However, the Debtor

testified that his monthly mortgage obligation to HSBC is $19,000.  The schedules also fail to

include approximately $127,000 which is allegedly owed to the Internal Revenue Service

according to its proof of claim.  The Debtor also testified that he has not file tax returns for a

number of years.  In addition, at the hearing on December 14, 2009, the Trustee questioned the

veracity of the schedules because they did not list the Debtor's bank account which the Trustee

had restrained upon the filing of the case.  The Debtor has had ample opportunity to file

complete and accurate schedules and statements in this case and has chosen not to do so.

Without a reliable record of the Debtor's assets and liabilities this Court cannot find that

creditors will not be prejudiced by the dismissal of this case.


### *Conclusion*

For all of the foregoing reasons, the Debtor's Motion to Dismiss is denied.  The Debtor's Stay

Motion is moot in light of this Decision and is denied as such without prejudice.  By this Decision, the

Court is not foreclosing the possibility that the Debtor might exit this Chapter 7 case expeditiously on a

consensual basis.   However, in order to dismiss this case the Debtor must first comply with his duties

under the Bankruptcy Code and satisfy the Trustee and this Court that creditors will not be unduly

prejudiced by such dismissal.

Finally, based upon the facts recited above including, but not limited to, the Debtor's failure to

comply with this Court's Order, dated September 24, 2009, the Trustee's Contempt Motion is granted in part.  The Contempt Motion was served on the Debtor on November 5, 2009 and he still has not complied with this Court's September 24th Order.  The Debtor is in contempt of this Court pursuant to 11 U.S.C. §105(a), however, the Court will not impose monetary sanctions at this time.  Rather, that portion of the motion is denied without prejudice to the Trustee's rights to seek monetary sanctions if the Debtor fails to comply in light of this Court's denial of the Motion to Dismiss.

A separate order will issue forthwith.

Dated: Central Islip, New York
  April 26, 2010            ***/s/ Robert E. Grossman***   
                      Robert E. Grossman
                      United States Bankruptcy Judge